UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

CAROL A. STEPIEN

*PLAINTIFF*,

V.

Gina Raimondo, UNITED STATES DEPARTMENT OF COMMERCE; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION (NOAA)

*Defendant.*

Case No.

**EMPLOYMENT DISCRIMINATION and RETALIATION COMPLAINT and DEMAND FOR JURY TRIAL**

COMES NOW PLAINTIFF, CAROL STEPIEN (PLAINTIFF), by and on her own behalf, and alleges as follows:

## I. INTRODUCTION

1.1     PLAINTIFF, Dr. Carol Stepien, ("PLAINTIFF") brings this action for damages and fees against Defendants for retaliation and discrimination. Defendant's actions as described in detail violated Title VII of the Civil Rights Act of 1964.

1

## II. PARTIES

2.1 PLAINTIFF Carol Stepien, is an adult female and a citizen of the United States.

2.2 Defendant Gina Raimondo, is the Secretary of the United States Department of Commerce.

2.3 The National Oceanic and Atmospheric Administration (NOAA) is an American scientific and regulatory agency within the United States Department of Commerce.

2.4 The United States Department of Commerce is a federal agency within the meaning of the FACA, 5 U.S.C. app. 2 § 3(3), and of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).

## III.  JURISDICTION & VENUE

3.1    Venue and jurisdiction are proper as all alleged acts took place in the Western District of Washington State.

## IV.  FACTS

**A. PLAINTIFF's Employment with the Department of Commerce.**

4.1 On October 17, 2016, PLAINTIFF began her employment with the NOAA as Research Division Leader and Supervisory Oceanographer, at the top GS15/10 level, to the Ocean Environment Research Division (OERD) of NOAA's Pacific Marine Environmental Laboratory (PMEL). PMEL is located on the Western Regional Center NOAA campus, with PLAINTIFF's responsibility to oversee the scientific research and administration of half of the PMEL research groups in Seattle, Washington, and all of those in Newport, Oregon housed at the Hatfield Marine Science Center. PLAINTIFF was the sole woman

2

in PMEL upper administration leadership (eight men and the PLAINTIFF), until a new

Director (Dr. Michelle McClure) began in February 2019; after that time through

PLAINTIFF's termination in April 2021, there were two women and seven men (Mr.

James Guyton, Mr. Eugene Burger, Mr. Christopher Meinig, Mr. Ogie Olanday, Mr.

Russell Richards, Mr. James Shambaugh, and Dr. Chidong Zhang (the latter is

PLAINTIFF's direct comparable, who was/is the other Research Division Leader; Zhang

was hired from a University a few months before the PLAINTIFF) into PMEL

Administration/Leadership.

4.2 The PLAINTIFF's position description as OERD Director required a Ph.D. degree and

years of successful research and leadership experience in Oceanography, stating, "*The*

*incumbent is the head of the Ocean Environment Research Division (PMEL); Has full supervisory*

*responsibility, as a first and second level supervisor. The incumbent conducts his/her own*

*research and directs the interdisciplinary research performed by the division's research and*

*technical staff. The incumbent manages the division's financial resources, which total over $10*

*million per year. The incumbent is an active researcher and formulates and guides research on*

*problems which have been recognized as critical obstacles to progress or development in the*

*science, or where solutions to problems represent a major advance in oceanography. Effectively*

*supervises the Division's highly skilled and experienced research and technical staff. Evaluates*

*performance standards of subordinates. Makes decisions on work problems presented by subordinate*

*supervisors, team leaders, or staff, or by contractors. Evaluates subordinate supervisors or leaders*

*and serves as the reviewing official on evaluations of nonsupervisory employees rated by subordinate*

*supervisors. Recommends selections for subordinate supervisory positions and for work leader, group*

*leader, or project director positions responsible for coordinating the work of others, and similar*

*positions. Hears and resolves group grievances or serious employee complaints. Determines whether*

3

*contractor performed work meets standards of adequacy necessary for authorization of payment. Approves expenses comparable to within-grade increases, extensive overtime, and employee travel. Recommends awards or bonuses for nonsupervisory personnel and changes in position classification, subject to approval by higher level officials, supervisors, or others. Finds and implements ways to eliminate or reduce significant bottlenecks and barriers to production, promote team building, or improve business practices. Listens and motivates staff to work at peak efficiency. Speaks on behalf of the division, PMEL, and NOAA in high-level fora. <u>Limited or no supervision - ability to act controls independently in almost all areas almost all of the time</u>*.". <u>Zhang's position description was the same for the Ocean Climate Research Division (OCRD).</u>

4.3 <u>Throughout PLAINTIFF's time at PMEL (2016-2021) there were no stated problems brought up in any of her annual or mid-term reviews about her job performance, mentorship, leadership, research performance, research publications, presentations, or any of the above. There was never any discussion with her of any problems or any complaints. In fact, PLAINTIFF received performance bonuses every year (2017, 2018, 2019, 2020).</u>

4.4     In her employed capacity, PLAINTIFF was responsible for overseeing six federally- head research reporting groups in the Ocean Environment Research Division (OERD); each headed by a federal scientist group leader at the GS15 (ZP5) level, whom she directly supervised. PLAINTIFF also supervised other federal scientists at the GS15 (ZP5) level. The OERD research groups collectively constituted about 80 scientists and research technicians as a combination of Federal employees, contractors, and University Cooperative Institute (CI) employees through four University Cooperative Institutes (variously headed at University of Washington, Oregon State University, University of Alaska, and University of Hawaii).

4.5     From her start on October 16, 2016 through her termination on April 11, 2021,

4

PLAINTIFF has made significant contributions to Leadership, Mentoring, and Research, abided by all NOAA and DOC rules and regulations, garnered renown to PMEL and its researchers, helped to found the new NOAA Omics Research program, and founded and established the new PMEL Genetics and Genomic Group (G3) that she also led; for the later, she obtained and brought in all funding required to sustain the same, including, but not limited to, grants and equipment, supplies, postdoctoral trainees, research scientists, technicians, and graduate and undergraduate research students/interns. At the time of her hire, PLAINTIFF brought all her genetics, genomics, and sampling equipment and supplies with her from the University of Toledo in an official signed transfer process from the University of Toledo to NOAA PMEL, continued to sponsor/mentor three University of Toledo PhD graduate students under her sole supervision (who all graduated in summer 2019), and founded the new PMEL Genetics and Genomics Group (G3) with the grant funds she personally brought into the University of Washington's Cooperative Institute JISAO (renamed CICOES in 2020) from the US EPA and the National Science Foundation. Those three projects totaled about $1.5 million in federal funding to the University of Toledo, which then were partially subawarded to the University of Washington (in order for PLAINTIFF to complete her ongoing research, graduate her three PhD students, and found her new Genetics and Genomics Group (G3)).

4.6     PLAINTIFF personally developed, wrote, and led successful research plans and all award funding for the PMEL NOAA Omics program and for the G3 Lab, networking with several existing PMEL research groups, other NOAA lab collaborators, and outside agency and university collaborators, which brought in significant new funding to PMEL from NOAA Omics Program, beginning in FY2018, and continuing in FY2019, FY2020, and FY2021 through her termination (600,000-800,000$ per year).

4.7     At all relevant times herein, the PLAINTIFF has maintained a stellar academic and professional record. In the year 2016-2017 (awarded in 2017), she was elected as a fellow of the American Association for the Advancement of Science, an accolade widely regarded as a very significant achievement, *Lifetime Honor, "For distinguished contributions to the fields of molecular evolutionary ecology and conservation genetics, particularly invasive and native populations, and mentorship of graduate and undergraduate students."*

4.8     PLAINTIFF has published approximately 121 peer-reviewed and approved scientific research papers and book chapters; including around 26 with PMEL numbers from 2016 through 2021; these all went through the PMEL approval process, and were read and signed off on by the PMEL Director, and then went through outside scientific peer review (anonymous) by renowned scientists and editors, and editorial approval by the scientific journals or book editors. There were no questions raised about any impropriety or scientific or other misconduct.

4.9     PLAINTIFF also was in charge of reviewing and signing off on all publications authored by the federal and university scientists in the NOAA PMEL OERD Research Division that she supervised (approximately 80 scientists).

4.10    PLAINTIFF has presented over 280 well-received professional scientific talks and seminars at top scientific conferences, for which she has won several awards; no scientific or other allegations have been raised against her.

4.11    While at PMEL, PLAINTIFF was the invited keynote opening speaker at three prestigious conferences, in which she gave hour-long presentations and answered questions; these were significant achievements honoring her scientific expertise in oceanographic genomics/genetics and the new NOAA Omics program.

4.12    In 2017 and 2018 at PMEL, PLAINTIFF received annual review scores of 5/5 for her research (perfect scores). In 2017 she received 4/5 in leadership and in 2018 she ranked 5/5 in leadership. Her publication rate and output increased in 2019 and 2020, despite considerable obstacles imposed by retaliation against her EEO complaint.

**B.  B. PLAINTIFF Files Informal EEO Complaint after Experiencing Disparate Treatment and a Hostile Work Environment Based on Gender and Age**

4.13    Since the beginning of her employment, PLAINTIFF experienced hostility from a younger Male colleague by the name of James "Jim" Guyton, who was then GS-14, and not in her chain of command. (Guyton was promoted and made her direct supervisor in April 2019, following her informal EEO complaint made in January 2019 against him).

4.14    During 2017 and extending through 2020, Guyton would question PLAINTIFF's integrity by repeatedly questioning PLAINTIFF about her laboratory equipment that was transferred from her previous university to NOAA (which was transferred in order to support her research work and completion of grants, projects, and graduation of her three university PhD students).

4.15    Guyton would also take offense when PLAINTIFF pointed out to him that 2016-2017 construction plans were not followed in the Genetics and Genomics Group (G3) lab that was being remodeled for PLAINTIFF's research, as it was Guyton's job duties to help the PLAINTIFF and to oversee the construction. Guyton continued this ongoing tirade about PLAINTIFFs 20x20 foot lab space, storage container, facilities, equipment, supplies, and samples for 4.5 years, throughout PLAINTIFF's time at PMEL. {In spring 2020, years later, under sworn affidavit, Guyton bizarrely (and belatedly) accused PLAINTIFF's husband of trying to negotiate a federal contract during that time (2016-2017). In truth, her husband merely

helped her measure her small lab space with a tape measure, talked with her about the layout, and helped her stick down foam flooring squares, as an invited guest for a few hours. Director McClure, who was not even at PMEL until February 2019, also swore to that baffling alleged 2016-2017 impropriety on the part of PLAINTIFF's husband in her sworn affidavit for the NOAA EEO inquiry in spring 2020}. This continued unjustified  triage against PLAINTIFF's research lab space never ended.

4.16    In October 2017, Guyton told PLAINTIFF that he purposely scrambled her log in password for her government-issued CAC card, when he was in her office and PLAINTIFF was suddenly called out by a colleague on October 17, 2017. Guyton stated to PLAINTIFF that he did this to "teach her a lesson" to not ever leave her CAC card unguarded; this necessitated her getting a new CAC card for computer and building access, which took weeks at government expense. This was despite the fact that CAC cards often are regularly left in computers both at PMEL and at NOAA headquarters in Silver Spring MD.

4.17    In December of 2017, Guyton told PLAINTIFF that she should not be "surprised" if she received an official complaint. (The Office of Inspector General FOIA records indicate the "anonymous" complaint was made on October 31, 2017, just after PLAINTIFF's excellent year one annual review by her then-supervisor (Dr. Christopher Sabine; 5/5 in Research, 4/5 in Leadership). This was very baffling to the PLAINTIFF as no one had ever told her of any complaints or issues.

4.18    Just a few days later, after being told of their impending call by Guyton (late December 2017), on January 4, 2018, PLAINTIFF received the disturbing news that an anonymous complaint was being investigated by the NOAA Office of Inspector General regarding the transfer of property from her previous university to NOAA.

4.19    One of PLAINTIFF's colleague's, Renee Womack at PMEL, revealed to PLAINTIFF that the anonymous complaint was filed by Guyton, who had been berating and disparaging PLAINTIFF even before she arrived at PMEL and had been complaining about the equipment transfer from the University of Toledo.

4.20    The January 2018 OIG complaint about the PLAINTIFF characterized PLAINTIFF as a "Scary Woman" who has "filed lawsuits" in the past; it was written in Guyton's distinctive vernacular. The OIG complaint falsely alleged that Dr. STEPIEN had somehow misappropriated property that was transferred from her previous job at the University of Toledo to NOAA.

4.21    The paperwork, however, proved otherwise, and was all in order. Ultimately, the January 2018 "anonymous complaint" filed against PLAINTIFF was ruled unfounded by the OIG, and the OIG ruled that all of the transfer paperwork was correct, and that all items were properly accounted for. Despite the PLAINTIFF being cleared by OIG of any wrongdoing, this same issue continued to be dredged up by Guyton for years to come, in a pattern of continued workplace hostility and harassment.

4.22    Guyton's Gender based hostility against PLAINTIFF still continued, and he persisted in attacking her reputation, as well as complaining about the equipment and the research for years through her end at PMEL on April 11, 2021. {To this date, Guyton and McClure moreover even have been uncooperative about the return of Stepien's personal office items, books, samples, etc.; they remain at PMEL as of this writing. All of the transferred equipment, supplies, and samples remain at PMEL, as well as all of PLAINTIFF's 4.5 years of research data, Omics funding, and Project plans.}

4.23    Starting in 2018, after the original Director of PMEL who had hired her left (Dr.

Christopher Sabine), PLAINTIFF noticed that she was increasingly being left out of leadership meetings with male colleagues.

4.24    In October 2018, the PLAINTIFF received her annual performance review prepared by Dr. Gary Matlock, the Deputy Assistant Director for Science, which review portrayed positive performance by the PLAINTIFF for that period (5/5 in Leadership, 5/5 in Research), meriting a bonus and a top ranking for PMEL.

4.25    On October 11, 2018, James Guyton disputed and challenged the PLAINTIFF's annual performance review after Guyton had requested PLAINTIFF's performance review scores, despite his not being in her chain of command; the NOAA EEO counsellor (Ms. Michelle T. Moore) later informed the PLAINTIFF that this was an illegal request on the part of Guyton, as he was not her supervisor and had no right to her performance scores.

4.26    Guyton proceeded to verbally challenge and discredit PLAINTIFF's performance during a PMEL Performance Committee meeting that Guyton convened on October 11, 2018. Guyton yelled in the PMEL hallways to Dr. Richard Feely (a mentor of PLAINTIFF's .who had served on the search committee to hire her) about her scores, and said that he (Guyton) was calling an emergency meeting of all PMEL federal principal investigators (PIs) to address her scientific research performance (held on October 12, 2018). On Upon information and belief, Guyton did not criticize the scores of similarly situated males who worked with PLAINTIFF. including Dr. Chidong Zhang (the other Research Division Leader; PLAINTIFF's comparable), Russell Richards, and Christopher Meinig.

4.27    On October 11-12, 2018, Guyton with James SHAMBAUGH (Deputy Division leader to both Zhang's and STEPIEN's Divisions) proceeded to distribute via email a false report challenging PLAINTIFF's publication record. No similar challenges were made about Zhang's

10

research. The false report was emailed to all PMEL federal principal investigators.

4.28    With the distribution of the false report, Guyton proceeded to call for an "emergency" meeting of all PMEL federal principal investigators, which meeting Guyton indicated was intended to discuss the PLAINTIFF's publication record and research performance.

4.29    The purpose of the meeting was intended to address the procedures for evaluating the PLAINTIFF's publication record, which Guyton falsely described as being non-peer-reviewed and thereby "worthless". Guyton also sought to retroactively change a 15-year extant written performance review policy at PME, after the annual performance reviews for the FY had already been completed. This accepted policy was written on PLAINTIFF's approved performance plan, which stated that scientists who were the primary research sponsor of a student and/or a postdoc who was in the first author publication place, should count those publications as equivalent to their own first-authorship (a common practice at universities). This rule was written on the PLAINTIFF's performance plan, as well as those of the other federal research scientists at PMEL. Guyton sought to change this rule retroactively and for the future. Guyton made no mention of Zhang's or others' publications, and Zhang was overseas (not present) during the meeting.

4.30    The PLAINTIFF was baffled by this sudden turn of events, as it was clearly indicated on her performance review that she performed very well during the period of the review, and had followed the established procedures for documenting her publications.

4.31    On October 22, 2018, at the close of the PMEL weekly staff meeting, Guyton yelled at PLAINTIFF in front of all of the PMEL (all male) leaders, and the administrative assistants, that he "had to call the "emergency" meeting of all federal PIs due to her scientific

11

publication shortcomings".  This was devastating to the PLAINTIFF.  No one said a word, but Zhang later told PLAINTIFF that he had told Guyton privately that wasn't appropriate.

4.32    Nonetheless, Guyton proceeded to attack the PLAINTIFF's credibility (and persisted through 2021, adding McClure to help head the attacks beginning with her appearance at PMEL in February 2019, and then to lead the attacks in May 2019 through 2021). As this was going on, the PLAINTIFF noted that the scrutiny and hostility was centered around her and not her younger male counterpart, Dr. Chidong Zhang.

4.33    Sometimes on or about fall of 2018, being frustrated by the sudden attack on her character for reasons not clearly laid out by Guyton, with Matlock's full knowledge, the PLAINTIFF proceeded to seek informal relief from the NOAA Equal Employment Opportunity Office (EEO), as it was apparent that Guyton pursued her and not her male counterpart for scrutiny, and that he was subjecting PLAINTIFF to a Hostile Work Environment based on Gender. Sadly, this avenue for relief did not yield any fruit.

4.34    The NOAA EEO counsellor (Michelle T. Moore) had PLAINTIFF copy all email messages and facts to Matlock, so that he would be kept fully informed.

4.35    Matlock responded by issuing PLAINTIFF a letter of reprimand on December 13, 2018, for a personal email to Shambaugh's own personal email stating how badly she felt treated by Guyton; this apparently then was officially NOAA emailed throughout PMEL male leadership by Shambaugh, and sent to all the male PMEL leaders, including Matlock, Guyton, Meinig, Richards, Zhang, and Burger.

4.36    Subsequently in January 2019, the PLAINTIFF proceeded to file an informal NOAA EEO complaint alleging hostile work environment based on Gender and Age, retaliation, and disparate treatment based on Gender and Age, which merely asked for the behavior by

Guyton to stop and for two-way formal mediation (which never happened).

4.37    Following the EEO informal complaint filed by the PLAINTIFF, on various occasions, the PLAINTIFF continued to be subjected to a hostile work environment by the new PMEL Director Michelle McClure (who began in February 2019), Guyton, and Matlock. The PLAINTIFF has been the subject of continuing challenges against her scientific research, research presentations, and research publications at the hands of Guyton and McClure after she filed her EEO informal complaint.

4.38    Throughout the year 2019 (and through her termination), Guyton and McClure both continued to question, scrutinize, and attack the PLAINTIFF's scientific work and invited seminar plenary talks in an attempt to discredit the PLAINTIFF and her professional achievements.

**C.  PLAINTIFF's Files First Formal EEO Complaint after Continuing to Experience Disparate Treatment, Hostility, and Retaliation Based on Gender, Age, following her Informal EEO Complaint.**

4.39     In April 2019, and just two to three months after filing her informal EEO complaint, Guyton was promoted by Matlock and became PLAINTIFF's immediate supervisor, . As such, Guyton was in a position to exert a level of authority over the PLAINTIFF.

4.40    Following Guyton's promotion, attempts were made by Guyton and McClure to get rid of the PLAINTIFF's use of her lab storage container. This was executed by their attempts to further minimize the amount of space available for use by the PLAINTIFF's research lab (lab is a mere 20x20 foot space). STEPIEN asked McClure if there was any economic reason for this, and McClure replied no.

4.41    On May 5, 2019, McClure sent PLAINTIFF an email asking that she again account for the equipment transferred to PMEL from the University of Toledo, back in 2016-2017 (two years before McClure began at PMEL;   again, dredging up Guyton's OIE investigation claims).

4.42    Equally so, the PLAINTIFF was gradually denied opportunities available to other employees including, but not limited to, traveling for purpose of speaking at conferences for purposes of promoting and publicizing her work and research, and helping the other scientists in her Division (her travel ceiling was reduced by ½ in 2019, whereas Zhang's was kept the same).

4.43    McClure then discredited works prepared by the PLAINTIFF, including a May 2019 research seminar talk given by the PLAINTIFF at the Hatfield Marine Science Center (Newport OR) and a prestigious June 2019 opening invited plenary address at the International Workshop on Environmental Genomics in Newfoundland Canada.

4.44    On May 9-12, 2019, Guyton sent PLAINTIFF  a series of harassing emails about her one-hour pre-arranged absence from a non-essential part of a two-day workshop, during which she attended an important research meeting that could not be rescheduled. {on July 2, 2019, McClure used Stepien's honest response as the grounds for "conduct unbecoming" and a 10-day suspension without pay).

4.45    Also, when two of PLAINTIFF's nominees won the very prestigious 2019 NOAA Distinguished Career Awards in May 2019– Dr. Phyllis Stabeno and Dr. Robert Embley, McClure and Guyton tried to charge their and their spouses' travel to accept their awards against PLAINTIFF's travel ceiling- rendering it "overspent", rather than rightly to the PMEL budget.

4.46    In May 2019, the PLAINTIFF communicated to McClure via email and in

person, notifying McClure of her ongoing concerns about discrimination, harassment, and retaliation from Guyton's response to her informal complaint, and shared the informal complaint with McClure.

4.47    On May 30, 2019 Guyton tried to get PLAINTIFF to sign a blank 2020 performance Plan for herself (which then could have been filled in by Guyton, without PLAINTIFF's knowledge to change her job performance criteria).  PLAINTIFF refused to sign a blank, and copied the refusal to McClure.

4.48    Since McClure communicated her full support of Guyton and full support of his retaliatory behavior to the PLAINTIFF, the PLAINTIFF consulted with RDML Dr. Timothy Gallaudet, who was then NOAA's Assistant Secretary of Commerce for Oceans and Atmosphere, and was championing the new NOAA Omics effort (which PLAINTIFF was helping to establish). PLAINTIFF kept the names as anonymous as possible. Gallaudet advised the PLAINTIFF to file a formal EEO complaint, and expressed astonishment that McClure and Matlock were not helping PLAINTIFF to right this wrong. The PLAINTIFF then had to go through another EEO counselling process, and filed a formal complaint at the end of June 2019.

4.49    On or about June 30, 2019, the PLAINTIFF lodged her first formal complaint with the EEO seeking relief from discrimination based on gender and age, hostile work environment based on gender and age, and retaliation for making an informal EEO complaint (which had merely requested 2-way mediation that never happened).

4.50    Two to three days after PLAINTIFF had filed her First Formal EEO complaint, on July 2, 2019, PLAINTIFF was called into PMEL Director McClure's office where the PLAINTIFF received a letter notifying her that she was placed on a 10-day unpaid suspension for alleged "conduct unbecoming" and "failure to follow instruction allegations."

15

4.51    The proposed ten-day suspension document issued by Dr. McClure criticized and proposed suspending PLAINTIFF for challenging Mr. Guyton's false accusations, harassment, and opposing his hostile behavior, and for mistakenly including one slide in PLAINTIFF's June 7, 2019 PMEL/HMSC Newport OR seminar talk. That slide was from a slide presentation that PLAINTIFF had been given permission to use by Dr. Francisco (Cisco) Werner, NOAA Fisheries, Chief Science Advisor and Director of Scientific Programs, who had used the slide himself in public scientific presentations, including one Dr. Werner gave at a meeting in Norway (in spring 2019). When PLAINTIFF was notified by McClure to remove the slide (after giving the Newport talk), PLAINTIFF promptly removed it, and did not present the slide in her opening invited plenary talk at the International Workshop on Environmental Genomics (IWEG) conference on June 11, 2019 in Newfoundland, Canada. PLAINTIFF  later (in mid-July 2019) figured out (after McClure issued her the 10-day suspension without pay), that there actually had been two slide decks sent by Werner (with permission for Stepien to use any/all/both); but Stepien was only aware of one. Dr. Mark Strom, McClure's former deputy supervisor at NWFSC, had asked PLAINTIFF by email not to use certain numbered ones, and PLAINTIFF had promptly eliminated all those in the slide deck with those numbers. It turned out that one single slide was duplicated in both slide decks and PLAINTIFF did not realize until a month later (mid-July, in trying to figure out what had happened), that there were two slide decks. PLAINTIFF apologized for the accidental mistake to Strom and to the scientist whose slide it was (Dr. Andrew Ole Shelton, who also presented in a May 29, 2019 conference talk that Stepien attended). PLAINTIFF's use of the slide was never questioned by Shelton. This was an innocent inconsequential misunderstanding, with no harm done to any parties or disclosure of any improper information, yet PLAINTIFF was punished by a severe 10-day suspension without

pay.

4.52    McClure, however, has not issued Guyton any discipline despite PLAINTIFF providing several facts and documentation to McClure and NOAA regarding Guyton's hostility and retaliation towards PLAINTIFF.

4.53    Furthermore, while in McClure's office, McClure, as she handed PLAINTIFF the 10-day suspension without pay notice, without justification or reason, verbally accused the PLAINTIFF of "breaking into labs" at McClure's former place of employment at the Northwest Fisheries Science Center (NWFSC) in Montlake, Seattle. This was not true. and Stepien had been to a few invited meetings there a year earlier, for which she had been accompanied (Stepien's CAC card does not work at other NOAA labs). This unfounded accusation left PLAINTIFF in tears, and as McClure berated Stepien, McClure handed her the 10 day suspension without pay notice, accusing her of "conduct unbecoming" and "failure to follow instructions" for the honest mishap of a single inconsequential slide in the Newport presentation, and for honest and straightforward response to Guyton's unreasonable beratement of PLAINTIFF for a pre-arranged and prior-informed absence of one hour to attend a critical research meeting.

4.54    On August 5, 2019, despite PLAINTIFF's appeal and providing the facts against the suspension, Matlock affirmed Dr. McClure's decision to suspend PLAINTIFF for 10 days without pay.

4.55    On October 31, 2019, Mr. Guyton prepared a performance review for PLAINTIFF and ranked her lower than her similarly situated Peer, Dr. Zhang. Guyton lowered PLAINTIFF's performance scores and wrote "no bonus" on it with full knowledge that the PLAINTIFF had filed an EEO complaint earlier in 2019. When PLAINTIFF complained,

Guyton raised it one point and changed his "no bonus" recommendation. PLAINTIFF's research publication and conference productivity was in fact, up from the previous years.

4.56    On December 5, 2019, Dr. McClure continued NOAA's disparate treatment of PLAINTIFF by proposing to apply different standards of review for PLAINTIFF's scientific publications compared to her similarly situated colleagues, including her comparable Division Leader peer, Dr. Chidong Zhang. McClure tried to add a new layer of NOAA peer review for the PLAINTIFF's research works alone (and not for any other PMEL scientists) in fall-winter 2019, to be signed off on and assessed before Stepien's manuscripts could be submitted to the PMEL process and then to scientifically peer-reviewed journals. This was not required for ZHANG or any other PMEL scientists. This was despite the fact that PLAINTIFF is Associate Editor for two peer-reviewed scientific journals, on the editorial board of another very prestigious scientific journal (Molecular Phylogenetics and Evolution), and has 121 publications.

4.57    Prior to PLAINTIFF's EEO complaint, PLAINTIFF's papers had at all times been approved and certified proper by PMEL, as well as by qualified science professionals and editors at highly-regarded scientific journals, and not questioned by Guyton or McClure or Matlock. or any other party.  McClure's effort was to disparage and harass the PLAINTIFF, to discredit her work in front of her students, postdocs, supervisees, and collaborators, and to slow her publication rate, success, and productivity.

4.58    On February 25, 2020, PLAINTIFF was informed of a new "anonymous" claim (filed by Guyton, in November 2019, worded in his distinctive vernacular) by the Office of Inspector General alleging (falsely) that PLAINTIFF had applied for positions at the University of Washington and was acting to interfere in the competition for a new Cooperative Institute

(false).  Both allegations were recognized as false and dismissed by the investigator (Dr. Eric Lochlear).

**D.  NOAA Places PLAINTIFF on Administrative Leave in May of 2020 in Retaliation for PLAINTIFF filing an EEO complaint and amendments**

4.59      Just a few days after McClure and Guyton were questioned by the EEO investigator, On May 18th, 2020, PLAINTIFF would be placed under administrative leave, which again was not reasonably justified by Guyton and McClure. McClure alleged "scientific and other misconduct" to be investigated about the "Bait Shop paper".

4.60      The PLAINTIFF remained in administrative leave for a period exceeding 11 months prior to her termination by McClure on April 11, 2020.

**E.  Further retaliatory actions against PLAINTIFF while on Administrative Leave.**

4.61       During administrative leave period, the PLAINTIFF was forbidden, via directives from McClure, from contacting or attempting to contact any employee from the NOAA (some 11,000 people), or any of her colleagues or those from Cooperating Institutes (some thousands).

4.62      The sole exceptions were that PLAINTIFF was stated to be allowed to complete her Great Lakes papers with her University of Toledo students, and to do her journal editing work, all of which needed to be documented in time each pay period to Guyton. Her NOAA email was taken away, and a message returned to all that she was out of the office and that all should contact Guyton. A temporary NOAA email account was set up for limited use that was embarrassing, and largely dysfunctional; allowing some filtered messages to pass

through, which she was not allowed to reply to.

4.63    The restrictions imposed by the directives isolated the PLAINTIFF professionally and socially and also prevented her from seeking other employment and references, and from seeking help

4.64    Upon information and belief, NOAA did not have a practice of restricting the communication of other employees similarly situated to PLAINTIFF who were male and had no history of filing EEO complaints.

4.65    In May-June of 2020, McClure, told PLAINTIFF that her published works, more specifically one termed the "Bait Shop Paper" was the reason for her being placed on Administrative Leave, alleging scientific and other unspecified misconduct.  This paper was being published as Snyder, M.R., C.A. Stepien, N. Marshall, H. Scheppler, C. Black, K. Czajkowski. **2020**. Detecting aquatic invasive species in bait and pond stores with targeted environmental DNA high-throughput sequencing metabarcode assays: Angler, retailer, and manager implications. *Biological Conservation*. 245: 108430. *https://doi.org/10.1016/j.biocon.2020.108430.*   PMEL approval #4940. It was lead-authored PLAINTIFF's newly-graduated PhD student (Matthew Snyder), and co-authored by PLAINTIFF, another of her PhD students (Nathaniel Marshall), her undergraduate research student intern (Hannah Scheppler), her colleague and co-PI Dr. Kevin Czajkowski, and Czajkowski PhD student Christopher Black).  No one has ever investigated this paper, or questioned it, to PLAINTIFF's knowledge; it was published and released to the public in May-June 2020.

4.66    The PLAINTIFF maintained her position that the research paper is valid and there was no misconduct as alleged, as the same was subject to scientific peer review and journal

editor approval, and had been signed off on by McClure during the PMEL review process (*PMEL #4940*). .  This paper went through scientific review by several anonymous peer review scientists, and editorial review and approval by a prestigious scientific journal (*Biological Conservation*).

4.67    Despite the information offered freely by the PLAINTIFF, McClure kept PLAINTIFF on administrative leave for 11 months to "investigate her".

4.68    In June 2020, EEO Investigator Salim Abddeem attempted to resolve with McClure and let Stepien return to work; McClure refused. Stepien thus filed a second EEO Complaint on June 4, 2020 alleging discrimination and retaliation by putting her on Administrative Leave and denying her rights to free speech and communication, even in her private off-work time.

4.69    Further, McClure proceeded to review the PLAINTIFF's emails spanning a period of over 4 years from when they were sent out by the PLAINTIFF.

4.70    It is the PLAINTIFF's knowledge and belief that lacking concrete evidence against the PLAINTIFF through her research papers, McClure instead chose to review the PLAINTIFF's emails with intention of incriminating the PLAINTIFF, regardless of content depth.

4.71    After many months of investigation (May 2020-January 2021), McClure proceeded to proclaim again that PLAINTIFF's conduct as "unbecoming" and a "failure to follow instructions" and recommended her removal.

4.72    It is the PLAINTIFF's knowledge and belief that the issues of "unbecoming" behavior and "failure to follow instructions" were not the reason the PLAINTIFF was suspended for ten (10) days without pay in summer 2019, or for putting her on  ~11 months of

administrative Leave (May 18, 2020 through April 11, 2021) but instead a pretext for discrimination and retaliation.

4.73    McClure entirely abandoned the earlier contentions for putting Plaintiff on administrative leave against the PLAINTIFF for lack of substance and instead latched onto the issues of "unbecoming" behavior and "failure to follow instructions" as grounds for terminating the PLAINTIFF's employment.

4.74    On January 2021, the PLAINTIFF was issued with a proposed removal letter.

4.75    Sometime in February 2021, the PLAINTIFF received a copy of the investigation report prepared against her along with other documents McClure relied upon to support her Plaintiff's removal. The PLAINTIFF had mere days to consume, digest, and rebut the investigation report and the conclusion thereof.

4.76    It is the PLAINTIFF's knowledge and belief that the investigation and supporting documents for her removal did not provide the necessary evidence to satisfy the threshold to dismiss the PLAINTIFF from employment, and instead showed that McClure conspired to discriminate and retaliate against PLAINTIFF based on her Gender, Age, and previous complaints of discrimination.

4.77    The investigation and supporting documents showed McClure edited a draft "complaint" about PLAINTIFF's workplace behavior filed by a white (~34-35-year-old) one-year male postdoctoral trainee, Christopher Paight, which falsely denigrated PLAINTIFF's management style and scientific reputation, and alleged scientific misconduct against "the bait shop paper" - PMEL #4940 (Snyder et al. 2020) published in *Biological Conservation*.

4.78    Paight's accusations also alleged scientific and other misconduct against that paper along with five other published scientific papers of PLAINTIFF's research team on

environmental DNA and metabarcoding. Stepien wrote and published the six papers with other postdoctoral advisees, colleagues, and graduate and undergraduate student advisees/interns ; i.e., PMEL #4616 (Klymus et al. 2017) published in *PLOS ONE*, PMEL #4987 (Stepien et al. 2019), published in *PLOS ONE*,  PMEL #4967 (Marshall and Stepien 2019) published in  *Ecology and Evoluti*on, PMEL #4967 (Marshall and Stepien 2020) published in *Environmental DNA*, and PMEL#4927 (Snyder and Stepien, 2020), published in *Metabarcoding and Metagenomics*.  The scientific works, which Paight accused as scientific misconduct in his "draft" letter, edited by McClure, had been thoroughly reviewed and vetted by scientific editors and anonymous reviewers in the scientific peer-review process. The metadata, databases, and results were publicly released upon publication, and all had been approved and signed off by NOAA PMEL (including the Director), and all have PMEL publication numbers. Paight was not involved in any of the lab work or any of the analyses, or any part of writing, editing, or the publication process of the six papers. The lab work for all of those projects was completed well before Paight began his one-year postdoctoral traineeship under PLAINTIFF's sole supervision at PMEL on May 6, 2019.

4.79    Despite above, Paight's invited draft letter to McClure, which was edited by her, was the "smoking gun" that led to McClure's accusations of scientific and "other" misconduct, 11 months of administrative leave, and a ban by McClure on all of PLAINTIFF's  NOAA Omics work, and all professional and personal communications with all NOAA personnel and university collaborators, including during her personal life.  This directive by McClure appeared in violation of PLAINTIFF's first amendment rights.

4.80     Plaintiff submitted a response to McClure's proposed removal letter. The response clearly pointed out several falsehoods, NOAA's failure to follow their own

policies to protect Plaintiff from accusations of research misconduct, and facts taken out

context that McClure used to support PLAINTIFF's removal. Plaintiff further pointed out

that McClure's decision to remove her was further evidence of discrimination based on

gender, hostile work environment based on gender, and retaliation for her previous EEO

complaints and that Guyton did not receive the same scrutiny as Plaintiff when she

complained about his workplace misconduct and discrimination.

4.81    PLAINTIFF remained under administrative leave until April 11th, 2021, when

the PLAINTIFF was issued with a final termination letter. The PLAINTIFF appealed to

Matlock, which was denied. The PLAINTIFF continues to be baffled and humiliated by the

actions of the Defendants as no other male, younger employees have been subjected to such

unreasonable scrutiny and reputation attacks as the PLAINTIFF has been the subject of.


**F.  PLAINTIFF files Third EEO Complaint after NOAA Proposed and Sustained Removal of her Position**

4.82    Upon issuance of the termination notice on April 11th, 2021, the PLAINTIFF

filed another Complaint before the EEO again alleging Discrimination, hostile work

environment based on Gender, and retaliation for opposing discriminatory activities

because the Defendant removed her from federal service.

4.83    The Defendant's Office of Civil Rights investigated PLAINTIFF's allegations of discrimination, harassment, and retaliation. The EEO investigator tried to negotiate a stop to the removal in spring 2021, by communicating with Mr. Craig McLean, Assistant Administrator for Oceanic and Atmospheric Research and Acting NOAA Chief Scientist, to no avail.

4.84    On September 17, 2021, Defendant's Chief, Program Implementation Division, Office of Civil Rights, Paul Redpath issued a Final Agency Decision regarding PLAINTIFF's removal.

## V. CAUSES OF ACTION

**FIRST CAUSE OF ACTION – Violation of Title VII of Civil Rights Act of 1964 (Disparate Treatment and Hostile Environment)**

5.1 PLAINTIFF incorporates and alleges paragraphs 1.1 through 4.84 as if fully set forth herein.

5.2 Through Defendant's actions and failures to act, as described above and incorporated here, Defendant violated Title VII in multiple ways, including but not limited to: failing to address PLAINTIFF's complaints of sex-based and age-based discrimination; discriminating against PLAINTIFF on the basis of sex by subjecting her to hostile work environment based on Gender; subjecting her to retaliation by suspending her after she filed EEO complaint; targeting her workplace behavior for scrutiny while restricting and isolating access to the PLAINTIFF; and ultimately removing PLAINTIFF for conduct that similarly situated employees are allowed, including: conversing with professional colleagues, complaining about supervisor and staff behavior, and performing valid and credible scientific work without being subject to discipline and removal.

5.3 The totality of circumstances and facts that PLAINTIFF was subjected to create a hostile work environment for PLAINTIFF based on Gender, Age, and her opposition to discriminatory practices.

5.4 The disparate treatment and retaliation have resulted in damages both economic and non-economic to be proven at trial.

**SECOND CAUSE OF ACTION – Retaliation for Engaging in a Protected Activity under Title VII (Retaliation)**

5.5 PLAINTIFF incorporates and alleges paragraphs 1.1 through 5.4 as if fully set forth herein.

5.6     In order to establish a prima facie case of retaliation, PLAINTIFF must show that (1) she or he engaged in a protected activity, (2) the employer engaged in an adverse employment action, and (3) the employer had knowledge of the action.

5.7     PLAINTIFF engaged in a protected activity under Title VII when she made several EEO complaints of discrimination to Matlock, and to MCLURE, and later filed formal complaints with the EEO. Indeed, PLAINTIFF made complaints about discrimination, retaliation, and harassment from fall of 2018 through May 2021.

5.8     After PLAINTIFF made her complaints, adverse actions happened in close proximity to PLAINTIFF complaints, which included Defendant suspending PLAINTIFF, placing her on administrative leave, instituting a gag order against PLAINTIFF while on administrative leave that restricted her personal and professional speech, and ultimately removing from her position based on conduct that similarly situated males; and employees who don't complain about discrimination, are not removed or reprimanded for and at NOAA.

5.9     The retaliation has resulted in damages both economic and non-economic to be proven at trial.

27

**VI. PRAYER FOR RELIEF**

WHEREFORE PLAINTIFF prays for relief as follows:

6.1     A declaration that Defendant violated PLAINTIFF's civil rights.

6.2     Removal of any record of PLAINTIFF's discipline from all personnel files and records.

6.3     Reinstatement of PLAINTIFF to her position, retroactive to April 10, 2021.

6.4     Damages for lost wages, back pay, front pay, lost benefits, medical expenses, retirement credit, and all other economic losses proximately caused by Defendant.

6.5     Damages for loss of enjoyment of life, pain and suffering, mental anguish, emotional distress, and humiliation.

6.6     Pre-judgment and post-judgment interest.

6.7     Compensation for any tax penalty associated with a recovery.

6.8     Reasonable attorney's fees and costs as authorized by Title VII.

6.9     Whatever further and additional relief the court shall deem just and equitable.

Dated October 15, 2021

                              NOLAN LIM LAW FIRM, PS


                              s/NOLAN LIM
                              _____
                              Nolan Lim
                              Nolan Lim Law Firm, PS
                              1111 Third Ave. Suite 1850
                              Seattle, WA 98101